1

2

3

UNITED STATES DISTRICT COURT
4
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
5

6   JOHN ALLEN BOOTH,
                                         Case No. 3:20-cv-06264-BHS-TLF
7                     Petitioner,
                                         REPORT AND
8         v.                             RECOMMENDATION

9   ERIC JACKSON,
                                         Noted for January 28, 2022
                      Respondent.
10

11          Petitioner, a state prisoner proceeding *pro se*, seeks habeas corpus relief under

12   28 U.S.C. § 2254, challenging the legality of his 2011 conviction after a jury trial of the

13   crimes of murder, attempted murder, attempted extortion and unlawful possession of a

14   firearm. Dkt. 1. Petitioner presents nine grounds for habeas relief, asserting his rights

15   were violated by: intrusion into his attorney-client relationship through four instances of

16   eavesdropping (Grounds 1–4 and 9); the trial court's preclusion of evidence of

17   petitioner's loss of confidence in counsel due to the eavesdropping incidents (Ground

18   5); the trial court's imposition of a restitution order (Ground 6); and ineffective

19   assistance of counsel (Grounds 7 and 8). *Id*. Petitioner does not request an evidentiary

20   hearing.

21          Respondent has filed an Answer and the relevant state court record. Dkts. 10,

22   11. Petitioner filed a traverse. [1] Dkt. 16. Respondent has not filed a reply.

23   ───────────────────────

[1] Petitioner also filed a motion for leave to submit an overlength traverse (Dkt. 15), to which respondent
24   has not replied. Pursuant to LCR 100(a), the Court's Local Rules pertaining to page limits do not apply to

25

REPORT AND RECOMMENDATION - 1

For the reasons set forth below, the Court recommends that the petition be

DISMISSED without an evidentiary hearing. The Court also recommends that issuance

of the certificate of appealability (COA) be DENIED.

## BACKGROUND

A.    Factual Background

The Washington Supreme Court Deputy Commissioner summarized the factual

background of petitioner's crimes as follows:

> John Booth was convicted in Lewis County Superior Court of two counts of
> first degree murder, one count of second degree murder, one count of
> attempted first degree murder, attempted first degree extortion, and first
> degree unlawful possession of a firearm. The convictions were based on
> the fatal shooting of two men [David West and Tony Williams] and a 16-
> year-old boy [West's son], and the shooting and wounding of a woman,
> Denise Salts, in connection with an attempted collection of an illegal drug
> debt. Ms. Salts identified Mr. Booth as the shooter, as did another man who
> had hidden during the massacre. After the shootings, Mr. Booth told an
> acquaintance that he had killed someone. Law enforcement traced Mr.
> Booth to Spokane, where he stayed at the residence of another man. Mr.
> Booth was arrested at that residence. In a recorded phone call Mr. Booth
> indicated that he hid a firearm at the residence. The police searched the
> residence and found the murder weapon hidden in the attic. Mr. Booth's
> DNA was on the firearm.

Dkt. 11-3 at 416 (Ex. 48). The Court of Appeals noted that petitioner testified at trial and

presented a different version of the facts:

> Booth claimed that West owed him money because he had "fronted" West
> a pound of high-grade methamphetamine to sell. VRP (Dec. 14, 2011) at
> 61–62. On the day of the murders, he and a friend had dropped by West's
> house to collect one of the weekly installment payments he and West had
> arranged. Because West did not yet have the money, but believed he would
> have it later that night, Booth left his friend with West and went about other
> business. Booth's friend later informed him that he had committed the
> murders. Booth claimed that he arranged to meet the friend the next day
> and took possession of the murder weapon in order to keep his friend out

habeas petitions unless directed by the court. The Court therefore GRANTS petitioner's motion and will
accept the traverse.

REPORT AND RECOMMENDATION - 2

of trouble. Because he had heard that the police sought him as a suspect in the murders, Booth went "on the lam."

Dkt. 11-2 at 733–34 (Ex. 15).

The jury convicted Booth on all charges. Dkt 11-2 at 604–05 (Ex. 9). On December 16, 2011, the trial court sentenced petitioner as a persistent offender to four consecutive terms of life imprisonment without the possibility of parole for the murder and attempted murder counts, with additional sentences of 60 months and 116 months for the attempted extortion and firearms counts. *Id*. at 608. The court also issued a restitution order of $6389.25 and provided that the obligation was joint and several with Ryan Joseph McCarthy, a co-defendant. Dkt. 11-2 at 614 (Ex. 10).[2]

B.    State Court Procedural History

1.    Direct Review

Petitioner, through counsel, brought a direct appeal alleging errors which—except for petitioner's claims regarding his restitution order—are not at issue in this petition. The Court of Appeals affirmed petitioner's conviction in an unpublished opinion. Dkt. 11-2 at 728–750 (Ex. 15). With respect to the restitution order, the Court of Appeals held that the trial court had no discretion to decline to order restitution because it was statutorily mandated—and, in any event, the challenge was not ripe because the State had not attempted to compel payment. Dkt. 11-2 at 748–49. The Washington Supreme Court denied review and the Court of Appeals issued its Mandate on March 10, 2015. Dkt. 11-2 at 798 (Ex. 18); Dkt. 11-2 at 800 (Ex. 19).

---

[2] The trial court subsequently amended the Judgment and Sentence to vacate all Legal Financial Obligations that were discretionary, but maintained petitioner's mandatory obligations, including the restitution order. Dkt. 11-2 at 616 (Ex. 11).

1

2      **2.    Collateral Review**

3      Petitioner also filed four collateral attacks on his verdict and sentence. The Court

4      discusses below only the two collateral review matters in which petitioner raised issues

5      related to the grounds asserted in his habeas petition: (a) petitioner's first motion to

6      vacate pursuant to Washington Superior Court Criminal Rule ("CrR") 7.8 and his appeal

7      of that decision, and (b) petitioner's second Personal Restraint Petition ("PRP") filed in

8      2016.[3]

9              **a.    First Motion to Vacate and Appeal**

10     On December 3, 2012, while petitioner's direct review was pending, petitioner

11     brought a motion to vacate pursuant to Washington Superior Court Criminal Rule

12     ("CrR") 7.8. Dkt. 11-2 at 802–839 (Ex. 20). Petitioner asserted that the State had

13     intruded into his attorney-client relationship by (1) recording his telephone calls with his

14     counsel, Roger Hunko; (2) recording his telephone calls with his investigator, John

15     Wickert; (3) placing officers outside the jail's non-soundproofed visiting room while

16     petitioner met with his attorney and (4) placing a detective, Daniel Riordan, in the

17     courtroom directly behind petitioner and his attorney. *Id*. at 803–805.[4] The trial court

18

19     ---

20     [3] In addition to petitioner's first CrR 7.8 motion and his 2016 PRP discussed herein, petitioner brought a second CrR 7.8 motion on March 29, 2013. Dkt. 11-3 at 56–78 (Ex. 36). The motion was transferred to the Court of Appeals as a PRP and dismissed (Dkt. 11-3 at 360–363 (Ex. 43)); the Washington Supreme Court denied discretionary review and the dismissal became final on March 11, 2016. *Id*. at 416–420, 422 (Exs. 48, 49). Petitioner also filed a third CrR 7.8 motion on April 24, 2018 (Dkt. 11-5 at 39–73 (Ex. 67)), which was transferred to the Court of Appeals as a PRP and dismissed as successive (Dkt. 11-5 at 355–56 (Ex. 71)). After denial of review, the dismissal became final on November 18, 2019. *Id*. at 434–35; 437 (Exs. 75, 76). Neither of these motions raises issues relevant to this Petition.

23     [4] Petitioner's motion alleged a fifth instance of alleged eavesdropping—arising out of the placement of an officer in a conference room in which petitioner conferred with his counsel during trial recesses. Dkt. 11-2 at 805. That issue is not raised in petitioner's federal habeas petition.

25

appointed counsel and conducted an evidentiary hearing, taking testimony from 28 witnesses over three days. Dkt. 11-2 at 841–409 (Exs. 21–23).

The trial court denied petitioner's motion, issuing oral findings on the record and written findings and conclusions. Dkt. 11-2 at 1389–1785 (Ex. 23); Dkt. 11-2 at 1451–1457 (Ex. 24). The trial court entered the following relevant written findings:

1.1. There was no pattern of eavesdropping on conversations between the defendant and his attorney.
. . .

1.5. After Mr. Booth was placed in the attorney visitation booth, the corrections staff would proceed down the hallway so that the inmate side of the interview room was still in view.
. . .

1.7. On the two occasions where corrections staff inadvertently overheard Mr. Booth yell to his lawyer, they immediately took steps to distance themselves away from the attorney/client booths where the conversations took place.

1.8. Lewis County corrections staff were never instructed, either by their own command staff, a detective assigned to the case, or the prosecutor's office, to eavesdrop on conversations between Mr. Booth and his lawyer.

1.9. No communication between Mr. Booth and his lawyer that may have been inadvertently heard by corrections staff was ever passed on to jail command staff, law enforcement, the criminal investigation side of the sheriff's office, or the prosecutor's office.

1.10. The members of the corrections staff doing transport of Mr. Booth had what the court referred to as a "self-imposed gag order" on any communication between Mr. Booth and his lawyer that might have been inadvertently overheard by transport officers.
. . .

1.14. There was nothing done intentionally, by anyone in the Lewis County corrections staff, law enforcement, or the prosecutor's office, to unlawfully compromise Mr. Booth's defense of his case.
. . .

1.16. Mr. Booth's assertion that he was intimidated or lost confidence in Mr. Hunko due to the condition of the attorney visitation booths was not supported by Mr. Hunko's testimony.

. . .

1.19. If a defense attorney gives the jail his/her phone number, that number is blocked in the jail phone call system so it cannot be recorded or intercepted.

. . .

1.20. There is no evidence that Mr. Hunko ever gave his phone number to the jail.

1.21. Officer Haskins listening [sic] to one recorded call, when he immediately realized that the call was between Mr. Booth and his attorney. He immediately stopped listening to the call and reported the call to his supervisor, Lieutenant Pea. Thereafter, that phone number was blocked so that no call to the number was recorded.

1.22. Officer Haskins did not report to anyone the content of [Booth's] phone call. Officer Haskins did not report the call to the law enforcement side of the Sheriff's office, the detectives, or the prosecutor's office.

. . .

1.31. The prosecutor's office never offered any evidence at trial that may have been remotely connected to privileged communications between Mr. Booth and his Attorney.

1.32. There is no evidence that Officer Haskins listened to any communication between Mr. Booth's private investigator (John Wickert) and Mr. Booth.

1.33. No communication between Mr. Booth and his private investigator was passed on to Officer West's command staff, the detectives, law enforcement, or the prosecutor's office.

1.34. When private investigator Wickert finally supplied a private number for Mr. Booth to call, that number was blocked in the jail's phone system so that calls could not be recorded.

Dkt. 11-2 at 1451–1457 (Ex. 24). The trial court concluded that petitioner had received a

fair trial and was not denied due process. *Id*. at 1456.

Petitioner appealed, and the Court of Appeals affirmed in an unpublished opinion, finding that substantial evidence supported the trial court's findings and that the findings supported the trial court's conclusion there was no violation of petitioner's rights. Dkt. 11-2 at 1721–38 (Ex. 29). The Washington Supreme Court denied review (Dkt. 11-3 at 51 (Ex. 34)), and the Court of Appeals issued its Amended Mandate on September 15, 2020 (Dkt. 11-3 at 53 (Ex. 35)).

b.    2016 PRP

Petitioner filed a *pro se* personal restraint petition (PRP) on January 12, 2016, while his first CrR 7.8 motion remained pending. Dkt. 11-3 at 424–482 (Ex. 50). Of the PRP's five claims, petitioner asserts two among his grounds for relief in his federal habeas petition: (1) that counsel provided ineffective assistance by failing to present expert and alibi testimony, and (2) that the trial court violated the Eighth Amendment by imposing a restitution order that he will never be able to pay. *Id*. at 460–465, 474–78. Because the petition was successive, the Court of Appeals transferred it to the Washington Supreme Court. Dkt. 11-4 at 11–12  (Ex. 53).

The Deputy Commissioner of the Washington Supreme Court dismissed the petition. Dkt. 11-4 at 431–441 (Ex. 58). The commissioner found that counsel was not deficient in choosing not to call a cell phone expert, because the expert's conclusions (contained in a declaration submitted by petitioner) were not competent evidence, would have been subject to cross-examination (and possible rebuttal evidence) from the State's expert, and contradicted both petitioner's own testimony and that of two eyewitnesses to the crimes. *Id*. at 437. The commissioner concluded that petitioner did not show a reasonable probability that the expert's testimony would have resulted in acquittal. *Id*.

The commissioner similarly found no ineffectiveness in defense counsel's failure to contact and interview alibi witnesses. *Id*. at 437–38. Petitioner submitted with his petition the affidavits of four witnesses, three of whom were fellow prisoners and all of whom had extensive criminal records. The commissioner found that the "veracity of these affidavits [is] highly questionable," noting that one affiant had denied seeing or signing his affidavit, another "partially recanted" his testimony and the others refused to confirm anything when contacted by a detective. *Id*. at 438. In light of the unreliability of the witnesses and the lack of any independent evidence petitioner had informed counsel or his investigators of the witnesses, the commissioner held petitioner's "bare assertions" were insufficient to support his claim that counsel was ineffective. *Id*.

Finally, the commissioner declined to revisit the Court of Appeals' determination on direct review that the restitution order imposed by the trial court did not violate petitioner's rights. *Id*. at 441–442.

The Washington Supreme Court denied petitioner's motion to modify the commissioner's ruling and issued a Certificate of Finality on September 12, 2017. Dkt. 11-5 at 35, 37 (Exs. 65, 66).

<u>DISCUSSION</u>

A.    <u>Exhaustion of State Court Remedies and Timeliness</u>

Exhaustion of state court remedies is a prerequisite to the granting of a petition for writ of habeas corpus. 28 U.S.C. § 2254(b)(1). Here, petitioner has presented his claims to the Washington Supreme Court and respondent agrees that he has exhausted his state court remedies. Dkt. 10 at 11. Furthermore, respondent does not contend that

1    the petition was untimely and the Court concludes that it was filed within the time

2    required by 28 U.S.C. § 2244(d).[5]

3         Petitioner's claims, therefore, will now be reviewed on their merits.

4    B.    Standard of Review

5         Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas

6    corpus petition may be granted with respect to any claim adjudicated on the merits in

7    state court only if (1) the state court's decision was contrary to, or involved an

8    unreasonable application of, clearly established federal law, as determined by the

9    Supreme Court, or (2) the decision was based on an unreasonable determination of the

10   facts in light of the evidence presented. 28 U.S.C. § 2254(d).

11        In considering claims pursuant to § 2254(d), the Court is limited to the record

12   before the state court that adjudicated the claim on the merits, and the petitioner carries

13   the burden of proof. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011); *see also*

14   *Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th Cir. 2013). "When more than one state

15   court has adjudicated a claim, [the Court analyzes] the last reasoned decision." *Barker*

16   *v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501

17   U.S. 797, 803–04 (1991)). Here, for purposes of Grounds 1–4 and 9, that decision is the

18   Court of Appeals' opinion affirming the denial of petitioner's first CrR7.8 motion (Dkt. 11-

19   2 at 1721–1738 (Ex. 29)). For purposes of Grounds 5–8, the last reasoned decision is

20   the Washington Supreme Court Deputy Commissioner's ruling dismissing petitioner's

21

22   _____

     [5] Petitioner filed his first CrR 7.8 motion during the pendency of petitioner's timely-filed direct appeal and
     its resolution did not become final until September 15, 2020. Dkt. 11-3 at 53 (Ex. 35). The limitations
23   period was tolled while that matter remained pending. 28 U.S.C. § 2244(d)(2). Petitioner filed his federal
     habeas petition on December 31, 2020, within the one year limitations period prescribed by 28 U.S.C.
24   § 2244(d)(1).

25

1    2016 PRP (Dkt. 11-4 at 431–441 (Ex. 58)). Copies of these two decisions are attached

2    to this Report and Recommendation.

3        A state court decision is "contrary to" the Supreme Court's "clearly established

4    precedent if the state court applies a rule that contradicts the governing law set forth" in

5    the Supreme Court's cases. *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting

6    *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). It also is contrary to the Supreme

7    Court's clearly established precedent "if the state court confronts a set of facts that are

8    materially indistinguishable from a decision" of the Supreme Court, "and nevertheless

9    arrives at a result different from" that precedent. *Id.*

10       A state court decision involves an "unreasonable application" of the Supreme

11   Court's clearly established precedent if: (1) the state court "identifies the correct

12   governing legal rule" from the Supreme Court's cases, "but unreasonably applies it to

13   the facts" of the petitioner's case; or (2) the state court "unreasonably extends a legal

14   principle" from the Supreme Court's precedent "to a new context where it should not

15   apply or unreasonably refuses to extend that principle to a new context where it should

16   apply." *Williams*, 529 U.S. at 407. The state court decision, however, must be "more

17   than incorrect or erroneous." *Lockyer*, 538 U.S. at 75. That is, "[t]he state court's

18   application of clearly established law must be objectively unreasonable." *Id.*

19       This is a "'highly deferential standard," which "demands that state-court decisions

20   be given the benefit of the doubt.'" *Pinholster*, 563 U.S. at 181 (quoting *Woodford v.*

21   *Visciotti*, 537 U.S. 19, 24 (2002)). "A state court's determination that a claim lacks merit

22   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

23   correctness of the state court's decision.'" *Harrington v. Richter*, 562 U.S. 86, 101

24

25

(2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 662, 664 (2004)). "[H]abeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment)). "As a condition for obtaining habeas corpus from a federal court," therefore, "a state prisoner must show that the state court's ruling on the claim being presented was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* at 103.

A habeas petition also may be granted "if a material factual finding of the state court reflects 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Juan H. v. Allen*, 408 F.3d 1262, 1270 n.8 (9th Cir. 2005) (9th Cir. 2005) (quoting 28 U.S.C. § 2254(d)(2)). A state court's factual determination is "presumed to be correct," though, and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). As such, a district court "may not simply disagree with the state court's factual determinations," but rather it must "conclude" that those determinations did not have even "fair support" in the state court record. *Thatsaphone v. Weber*, 137 F.3d 1041, 1046 (8th Cir. 1998).

"[W]hether a state court's decision was unreasonable" also "must be assessed in light of the record the court had before it." *Holland v. Jackson*, 542 U.S. 649, 652 (2004);  *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003). The district court's review "focuses on what a state court knew and did," and the state court's decision is "measured against [the Supreme] Court's precedents as of 'the time the state court

1  renders its decision.'" *Pinholster*, 563 U.S. at 182 (quoting *Lockyer v. Andrade*, 538 U.S.

2  63, 71–72 (2003)); *see also Greene v. Fisher*, 565 U.S. 34, 38 (2011). In addition,

3  "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502

4  U.S. 62, 67 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-

5  court determinations on state-law questions.") (citing *Lewis v. Jeffers*, 497 U.S. 764, 780

6  (1990)).

7  C.    **Grounds (1)–(4) and (9): Intrusion into Attorney-Client Relationship**

8         Petitioner contends that the State violated his Fifth, Sixth and Fourteenth

9  Amendment rights by intruding into his attorney-client relationship on four occasions: (1)

10 by recording a telephone call with his attorney from jail; (2) by recording his telephone

11 calls with his private investigator; (3) by placing a detective behind petitioner during trial,

12 where petitioner believes the detective could overhear conversations between petitioner

13 and his counsel; and (4) by placing sheriff's deputies outside the jail's non-

14 soundproofed visiting room at the jail while petitioner met with his counsel. Dkt. 1. at 5,

15 7, 8, 10 (Grounds 1–4). Petitioner also contends that these instances cumulatively

16 comprise a Sixth Amendment violation. *Id*. at 19 (Ground 9).

17        The Supreme Court has explicitly rejected a per se rule that government intrusion

18 into attorney-client communications automatically gives rise to a Sixth Amendment

19 violation of a defendant's right to counsel. Instead, there must be some indication that

20 the prosecution actually used the evidence that might otherwise be inadmissible at trial,

21 thereby resulting in prejudice. *Weatherford v. Bursey*, 429 U.S. 545 (1977). Thus, "when

22 conversations with counsel have been overheard, the constitutionality of the conviction

23 depends on whether the overheard conversations have produced, directly or indirectly,

24 any of the evidence offered at trial." *Id*. at 552.

25

1    Similarly, when an agent of the prosecution overhears a conversation, there can

2  be no Sixth Amendment violation **"unless [the agent] communicated the substance of

3  the [attorney-client] conversations and thereby created at least a realistic possibility of

4  injury to [the defendant] or benefit to the State."** *Id*. at 558.

5    Applying *Weatherford*, the Ninth Circuit has held that "mere government intrusion

6  into the attorney-client relationship, although not condoned by the court, is not itself

7  violative of the Sixth Amendment right to counsel." *United States v. Irwin*, 612 F.2d

8  1182, 1186–87 (9th Cir. 1980)) (internal quotations omitted). Instead, the intrusion must

9  result in substantial prejudice—which "results from the introduction of evidence gained

10  through the interference against the defendant at trial, from the prosecution's use of

11  confidential information pertaining to defense plans and strategy, and from other actions

12  designed to give the prosecution an unfair advantage at trial." *Williams v. Woodford*,

13  384 F.3d 567, 585 (9th Cir. 2004) (citing *Irwin*, 612 F.2d at 1187).

14    Here, the trial court appointed counsel and held an extensive three-day

15  evidentiary hearing, taking testimony from 28 witnesses. Dkt. 11-2 at 841–1409 (Exs.

16  21–23). In detailed oral and written findings addressing each of the claimed intrusions,

17  the court found there was no deliberate pattern of eavesdropping, the intrusions had

18  been isolated and inadvertent, and steps had been taken to prevent them going

19  forward. Dkt. 11-2 at 1451–53. The trial court also found that none of the information

20  from the inadvertently overheard conversations had been passed on to, or used by, the

21  prosecution. *Id*. at 1453.

22    The Court of Appeals held these findings were supported by substantial evidence

23  and supported the trial court's conclusion that petitioner had not been prejudiced.

24

25

1

2      Here, the court found that when Booth [sic] and Lamping overheard
       Booth's conversation in the visitation room, they immediately distanced
3      themselves. It also found that West, Lamping, and the other transport COs
       had a "self-imposed gag order" where they would not and did not share
4      any information inadvertently overheard. CP at 354. Haskins similarly did
       not share the content of the attorney-client telephone call that he
5      inadvertently overheard. . . . Finally, "[n]o communication between Mr.
       Booth and his lawyer that may have been inadvertently heard by
6      corrections staff was ever passed on to jail command staff, law
       enforcement, the criminal investigation side of the sheriff's office, or the
       prosecutor's office." CP at 353. Therefore, we conclude that the trial
7      court's findings support the conclusion that Booth was not prejudiced.

8      Based on all of the above, we conclude that substantial evidence supports
       the trial court's findings and that its findings support its conclusion that no
9      violation of Booth's right to effective representation or due process
       occurred.[6]

10   Dkt. 11-2 at 1731 (Ex. 29) (footnote omitted).

11         Petitioner fails to show that the state appellate court's decision addressing these

12   claims was contrary to, or involved an unreasonable application of, clearly established

13   federal law—or involved an unreasonable determination of the facts. The record here

14   supports the state court's findings and conclusions. The three-day evidentiary hearing

15   produced no evidence that any information gleaned in any of the four incidents was

16   passed on to the prosecutor's office or any member of the investigation team, let alone

17   actually used at trial. Instead, the trial court expressly found, after hearing from 28

18   witnesses, that it was not.

19

20   [6] The Court of Appeals also noted, with respect to petitioner's third ground regarding detective Riordan,
     that Riordan was providing extra security in the courtroom and was told by his supervisor to sit in the first
21   row behind petitioner:

22         At one point during a pretrial hearing, Booth accused Riordan of listening to his attorney-
           client conversations. Booth informed the court of his concerns, and the court excluded
23         Riordan. . . . At no point during his time as security did Riordan overhear or intend to
           overhear conversations between Booth and his lawyer. He also did not see any notes
           written by Booth or his attorney.

24   Dkt. 11-2 at 1726 (Ex. 29).

25

REPORT AND RECOMMENDATION - 14

1    Petitioner contends that the state court's findings are unreasonable

2    determinations of the facts. The state court's factual determinations are presumed to be

3    correct, and petitioner has the burden of rebutting the presumption by clear and

4    convincing evidence. 28 U.S.C. § 2254(e)(1). Petitioner first points to testimony the

5    transport officers guarding the jail's visitation rooms discussed an overheard

6    conversation among themselves. Dkt. 16 at 19. Next, petitioner cites testimony by

7    Haskins' supervisor that he was unaware of recorded conversations between petitioner

8    and his counsel, asserting this shows the supervisor took no action to delete them. *Id*. at

9    20. Petitioner also speculates that officers could have listened to recordings made of his

10   conversations with his investigator before the phone number was blocked. *Id*. at 25.

11   Finally, petitioner argues that the trial judge ejected detective Riordan from the

12   courtroom after petitioner complained Riordan was "ear hustling" him.[7] *Id*. at 26–27.

13   Petitioner fails to establish that any attorney-client privileged information was

14   actually provided to or used by the prosecution team—and petitioner only speculates

15   that it could have been. Petitioner has not provided clear and convincing evidence to

16   rebut the state court's finding that "[n]o communication between Mr. Booth and his

17   lawyer that may have been inadvertently heard by corrections staff was ever passed on

18   to jail command staff, law enforcement, the criminal investigation side of the sheriff's

19   office, or the prosecutor's office." Dkt. 11-2 at 1731 (Ex. 29).[8]

20

21   [7] The trial judge clarified that he had removed Detective Riordan not for suspected eavesdropping but because "there was obvious antagonism" between Riordan and petitioner that was disruptive of the trial. Dkt. 11-2 at 1423 (Ex. 23).

22   [8] This finding is supported by the record. Officer Haskins testified that he did not reveal the substance of the inadvertently recorded call between petitioner and counsel to anyone and did not monitor calls with petitioner's investigator. Dkt. 11-2 at 1205–06 (Ex. 22). The transport officers likewise did not disclose inadvertently overheard conversations to prosecutors or law enforcement. Dkt. 11-2 at 941–43, 1021–23 (Ex. 21). Detective Riordan testified he did not overhear conversations between petitioner and his

23

24

25

REPORT AND RECOMMENDATION - 15

Supreme Court precedent clearly establishes that an intrusion into the attorney-client relationship violates the Sixth Amendment only where "the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial." *Weatherford*, 429 U.S. at 552. Petitioner provides no evidence of any such use, and the state court found, based upon evidence in the record, that there was none. Accordingly, as in *Weatherford*, "there being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion . . ., there was no violation of the Sixth Amendment." *Id*.

The Court of Appeals' dismissal of petitioner's appeal is a reasonable application of controlling federal law and petitioner has not rebutted the presumption that its factual determinations were correct. This Court therefore recommends that petitioner's first, second, third and fourth grounds for relief be dismissed with prejudice.

Petitioner's contention that the intrusions, collectively, amount to a violation of his Sixth Amendment rights also fails.[9] Under some circumstances, even if a single error is insufficient to warrant relief, "the cumulative effect of multiple errors may still prejudice a defendant." *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002) (*citing United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996)). In this case, though, petitioner has established no constitutional error arising out of his claims because the record

counsel. Dkt. 11-2 at 1218, 1222 (Ex. 22). Finally, law enforcement and prosecutor witnesses verified that they neither ordered any eavesdropping nor were made aware of any overheard statements between petitioner and his counsel. Dkt. 11-2 at 986, 1000, 1011–12 (Ex. 21); Dkt. 11-2 at 1136, 1179–80, 1212 (Ex. 22); Dkt. 11-2 at 1263–64, 1296–1300 (Ex. 23).

[9] Petitioner's traverse characterizes his ninth ground as asserting a cumulative claim as to all of the grounds alleged in the petition. The petition, however, applies this ground only to "all the ways that the State interfered with Mr. Booth's right to counsel." Dkt. 1 at 19. Petitioner cannot assert new grounds in his traverse. The Court, therefore, construes the ninth ground as asserting that the multiple intrusions into his attorney-client relationship cumulatively amount to a Sixth Amendment violation. However, the Court's analysis would also apply if all of petitioner's grounds were considered collectively.

demonstrates that none of the overheard information was communicated to the prosecution or used at trial. Accordingly, there is "nothing to accumulate to the level of a constitutional violation." *Mancuso* 292 F.3d at 957. The Court therefore recommends that petitioner's ninth ground for relief be dismissed with prejudice.

D.    **Ground 5: Evidentiary Ruling during CrR 7.8 Hearing**

Petitioner contends that the trial court violated his Fourteenth Amendment rights during the CrR 7.8 hearing when it sustained an objection to petitioner's testimony that the eavesdropping incidents had caused him to lose confidence in his counsel. Dkt. 1 at 12. Respondent argues that federal habeas relief is not available to redress procedural errors during state post-conviction review. Dkt. 10 at 24.

The Court of Appeals held that the trial court properly excluded further testimony regarding petitioner's loss of confidence in his counsel because it was cumulative under state evidentiary rules. The court observed:

> [I]t seems clear that the trial court viewed Booth's proposed testimony . . . as the "needless presentation of cumulative evidence." ER 403. It recognized that Booth had filed a bar complaint against Hunko, and it was aware that Booth had been unsatisfied with Hunko's representation. Viewing the totality of testimony, we conclude that the trial court did not abuse its discretion in limiting Booth's testimony.

Dkt. 11-2 at 1734 (Ex. 29). Furthermore, the evidence is not relevant to the issue of whether petitioner had been substantially prejudiced by the use of evidence gained through interference in his attorney-client relationship.

Moreover, this issue is not cognizable because it does not raise a federal constitutional claim for relief. A petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings. *Franzen v. Brinkman,* 877 F.2d 26 (9th Cir. 1989). *See also Ortiz v. Stewart,* 149 F.3d 923, 939

1    (9th Cir. 1998), ("this court has specifically stated that federal habeas relief is not

2    available to redress alleged procedural errors in state post-conviction proceedings."),

3    *overruled on other grounds Apelt v. Ryan*, 878 F.3d 800, 827 (9th Cir. 2017); *Gerlaugh*

4    *v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997) (rejecting "attempt[ ] to elevate alleged

5    errors in Arizona's post-conviction relief proceedings to federal constitutional status").

6        Petitioner's fifth ground for relief does not state a cognizable habeas claim and

7    should therefore be dismissed with prejudice.

8    E.    **Ground 6: Restitution Order**

9        Petitioner claims that the trial court's inclusion of an order of restitution in his

10    sentence violates his Eighth Amendment rights by imposing an excessive fine that he

11    will never be capable of paying. Dkt. 1 at 17. Respondent contends that this Court lacks

12    subject matter jurisdiction over this claim because there is no nexus between a court-

13    imposed monetary obligation and petitioner's custody. Dkt. 10 at 26.

14        Federal jurisdiction over a habeas petition arising from a state court judgment is

15    limited to persons "in custody" pursuant to that judgment. 28 U.S.C. § 2254(a). Section

16    2254 "explicitly requires a nexus between the petitioner's claim and the unlawful nature

17    of the custody." *Bailey v. Hill*, 599 F.3d 976, 980 (9th Cir. 2010) (citing *Dickerson v.*

18    *United States,* 530 U.S. 428, 439 n. 3 (2000)). Challenge to a restitution order does not

19    provide such a nexus. *Bailey*, 599 F.3d at 980–81. *See also Williamson v. Gregoire,* 151

20    F.3d 1180, 1183 (9th Cir. 1998) ("[C]ourts hold that the imposition of a fine or the

21    revocation of a license is merely a collateral consequence of conviction, and does not

22    meet the 'in custody' requirement.").

23        Claims for relief from a restitution order cannot be brought in a federal habeas

24    corpus petition, even if petitioner also asserts a cognizable claim for release from

25

REPORT AND RECOMMENDATION - 18

1    custody in the same petition. *United States v. Thiele,* 314 F.3d 399, 402 (9th Cir. 2002)

2    (interpreting 28 U.S.C. § 2255). *See also Tuggle v. Campbell*, 261 F. App'x 56, 58 (9th

3    Cir. 2007) ("We lack jurisdiction to review Tuggle's assertion that the $10,000 fine is

4    grossly disproportionate to his crime . . . The fact that Tuggle seeks release from

5    custody in addition to relief from his fine does not create jurisdiction to review the fine").

6          Petitioners sixth ground for relief is not cognizable and the Court therefore

7    recommends that it be dismissed with prejudice.

8    F.    **Counts 7 and 8: Ineffective Assistance of Counsel**

9          Petitioner claims that he received ineffective assistance of counsel for two

10   reasons: (1) counsel failed to consult with and present an expert witness in cell phone

11   triangulation; and (2) counsel failed to investigate alibi witnesses. Dkt. 1 at 15, 17.

12   Respondent argues that the state court's dismissal of those claims was based upon a

13   reasonable application of controlling federal law and is entitled to deference pursuant to

14   28 U.S.C. § 2254(d). Dkt. 10 at 28–10.

15         The Sixth Amendment guarantees a criminal defendant the right to effective

16   assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). "The essence of

17   an ineffective-assistance claim is that counsel's unprofessional errors so upset the

18   adversarial balance between defense and prosecution that the trial was rendered unfair

19   and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).

20          Claims of ineffective assistance of counsel are evaluated under the two-prong

21   test set forth in *Strickland*. A defendant must prove (1) that counsel's performance was

22   deficient and, (2) that the deficient performance prejudiced the defense. *Strickland*, 466

23   U.S. at 687. The reviewing court need not address both components of the inquiry if an

24   insufficient showing is made on one component. *Id*. at 697.

25

1    Under the first prong of the *Strickland* test, a petitioner must show that counsel's

2    performance fell below an objective standard of reasonableness. *Id*. at 688. Judicial

3    scrutiny of counsel's performance must be highly deferential. *Id*. at 689. "A fair

4    assessment of attorney performance requires that every effort be made to eliminate the

5    distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

6    conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id*. In

7    order to prevail on an ineffective assistance of counsel claim, a petitioner must

8    overcome the presumption that counsel's challenged actions might be considered

9    sound trial strategy.

10    The second prong of the *Strickland* test requires a showing of actual prejudice

11    related to counsel's performance. In order to establish prejudice, a petitioner "must

12    show that there is a reasonable probability that, but for counsel's unprofessional errors,

13    the result of the proceeding would have been different. A reasonable probability is a

14    probability sufficient to undermine confidence in the outcome."  *Id*. at 694.

15    While the Supreme Court established in *Strickland* the legal principles that

16    govern claims of ineffective assistance of counsel, it is not the role of the federal habeas

17    court to evaluate whether defense counsel's performance fell below the *Strickland*

18    standard. *Harrington*, 562 U.S. at 101. Rather, when considering an ineffective

19    assistance of counsel claim on federal habeas review, "[t]he pivotal question is whether

20    the state court's application of the *Strickland* standard was unreasonable." *Id*. Under this

21    "doubly deferential" standard, "a federal court may grant relief only if *every* 'fairminded

22    juris[t]' would agree that *every* reasonable lawyer would have made a different

23    decision." *Dunn v. Reeves*, 141 S. Ct. 2405, 2411 (2021) (quoting *Harrington*, 562 U.S.

24

25

at 101) (emphasis in original). As the Supreme Court explained in *Harrington*, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101.

1. Expert Witness

Petitioner asserts that the testimony of a cell tower triangulation expert would have placed him away from the scene of the crimes at the time they occurred. Dkt. 1 at 15. Petitioner contends that after the State announced it would not be calling its cell tower expert, petitioner's counsel should have prepared and presented a defense expert on the subject.

As the Washington Supreme Court Deputy Commissioner noted, petitioner's counsel contacted such an expert, Jeff Fischbach, but ultimately did not call him as a witness. Dkt. 11-4 at 436 (Ex. 58). Petitioner included with his PRP an affidavit he subsequently obtained from Mr. Fischbach. Dkt. 11-3 at 549–550 (Ex. 50). As the commissioner noted, Mr. Fishbach's affidavit "makes a preliminary conclusion that Mr. Booth was not in the vicinity of the shooting 'within several hours' of that event." *Id*. But this testimony, the commissioner held, failed to include a proper foundation and was not competent evidence. *Id*. at 437–48. And more fundamentally,

> Mr. Fischbach's conclusion contradicts Mr. Booth's own version of events, which has him leaving the scene of the shooting much closer in time to the event. Moreover, two eyewitnesses placed Mr. Booth at the scene at the time of the shooting, including a surviving victim who recalled being shot by Mr. Booth. And Mr. Fischbach would have been subject to cross-examination on his methods and the reliability of his conclusions, and possibly rebuttal evidence from the State's cell phone expert.

*Id*. at 448. The commissioner concluded that even if counsel had been deficient in not calling Mr. Fischbach (which the commissioner did not decide), petitioner "does not

1  show there is a reasonable probability that putting him on the stand would have resulted
2  in acquittal." *Id*.

3      The commissioner's conclusion is properly accorded deference. The
4  commissioner reasonably found that the potential evidence from Mr. Fischbach was
5  weak: its admissibility is questionable as it lacked a proper foundation; it provided no
6  discussion of the methodology upon it relies; and it would have been vulnerable to
7  attack on cross-examination on its methods and reliability. Moreover, the evidence
8  directly contradicted petitioner's own testimony that he had been at the scene of the
9  crime, as well as the strong eyewitness testimony from petitioner's victims and evidence
10  of petitioner's DNA on the murder weapon.

11      The commissioner reasonably applied the *Strickland* standard.[10] Counsel's
12  "strategic decisions—including whether to hire an expert—are entitled to a 'strong
13  presumption' of reasonableness." *Dunn*, 141 S. Ct. at 2410 (*quoting Harrington*, 562
14  U.S. at 104). Petitioner has failed to demonstrate a reasonable probability that but for
15  counsel's failure to introduce Mr. Fischback's testimony, the jury's verdict would have
16  been different. *Cunningham v. Wong*, 704 F.3d 1143, 1158–59 (9th Cir. 2013) (state
17  court reasonably determined counsel was not ineffective for failure to present
18  "extremely weak" testimony that contradicted petitioner's statement to the police). The

19

20  [10] Petitioner argues that the commissioner applied the "wrong standard" in holding that petitioner had not
shown a reasonable probability that Mr. Fishback's evidence would have "resulted in acquittal." Dkt. 16 at
21  41. Petitioner contends the correct standard is whether the evidence "could have changed the outcome."
*Id*. The actual wording of the *Strickland* standard is "the result of the proceeding would have been
22  different." *Strickland*, 466 U.S. at 694. But in any event, there is no meaningful difference between these
formulations and courts have used them interchangeably. *See, e.g. Johnson v. Cain*, 639 F. App'x 259,
23  260 (5th Cir. 2016) (quoting the *Strickland* standard and concluding petitioner failed to establish a
reasonable probability that omitted testimony "would have resulted in acquittal.")

24  .

25

1   Court therefore recommends that petitioner's seventh ground for relief be dismissed

2   with prejudice.

3       2.    Alibi Witnesses

4       Petitioner also asserts that counsel was ineffective in failing to develop alibi

5   testimony. Dkt. 1 at 17. Respondent contends that the commissioner's application of the

6   *Strickland* standard was not unreasonable, particularly in light of the weakness of

7   petitioner's proffered alibi testimony and the absence of independent evidence that

8   petitioner's counsel or his investigator were informed of potential alibi witnesses. Dkt. 10

9   at 33–40.

10      Petitioner does not identify specific alibi witnesses in his petition. Dkt. 1 at 17.

11  However, in his PRP proceeding, petitioner presented affidavits of co-defendant Ryan

12  McCarthy and three additional witnesses, Corey Wimmer, Joshua Rhoades and Gordon

13  Harper. Dkt. 11-3 at 484, 543, 545, 547 (Ex. 50). The State submitted a report in the

14  PRP proceeding (signed under penalty of perjury) from a detective who interviewed

15  each of these witnesses. Dkt. 11-4 at 149–154. (Ex. 56).

16      The commissioner, noting that all four witnesses were either incarcerated and/or

17  had extensive criminal records, as well as the results of the detective's interviews, found

18  the "veracity of these affidavits [is] highly questionable." Dkt. 11-4 at 437 (Ex. 58). The

19  commissioner found the following weaknesses in each affidavit:

20      Mr. McCarthy confirmed to the detective that he had never seen the
        affidavit before and he did not sign it. Mr. Harper confirmed signing the
21      affidavit, in which he claims he was with Mr. Booth at the "Red Barn" tavern
        when the shooting occurred elsewhere. But he partially recanted to the
22      detective, saying he actually could not recall the day and time that he was
        with Mr. Booth at the Red Barn. Mr, Rhoades, who claimed to be with Mr.
23      Booth at the Red Barn when the shooting occurred, and that he
        unsuccessfully tried to contact defense counsel, refused to confirm anything
24      about the affidavit when contacted by the detective. Mr. Wimmer states in

25

REPORT AND RECOMMENDATION - 23

1
2
3

the affidavit that he met Mr. Booth at 2 a.m. on "a Saturday" and that he unsuccessfully tried to contact defense counsel. When contacted by the detective, Mr. Wimmer merely said that the affidavit speaks for itself and that he signed it. He also said he did not like "snitches," apparently referring to Mr. McCarthy.

4    Dkt. 11-4 at 438–439 (Ex. 58).

5    Petitioner's PRP also attached his own affidavit contending that he identified alibi

6    witnesses, but his defense counsel refused to contact them. Dkt. 11-3 at 496 (Ex. 50).

7    Petitioner did not submit any independent evidence from his counsel or investigator to

8    corroborate this contention. Indeed, the record indicates that petitioner did not waive his

9    attorney-client privilege to enable counsel to provide such information. Dkt. 11-4 at  63

10    n.4 (Ex. 55). Thus, as the commissioner observed, petitioner provided no independent

11    evidence supporting petitioner's assertions that counsel refused to contact identified

12    alibi witnesses. Dkt. 11-4 at 438 (Ex. 58).

13    The commissioner found that counsel had not been ineffective in declining to

14    present evidence of such a "highly questionable" nature. Dkt. 11-4 at 438 (Ex. 58). But

15    further, the commissioner found the lack of credible evidence petitioner had even

16    provided alibi evidence to his counsel also defeated petitioner's claim he had received

17    ineffective assistance:

18
19
20
21
22
23
24

The veracity of these affidavits [is] highly questionable, particularly in light of the apparent forgery of Mr. McCarthy's signature. *See Milton v. Sec'y, Dep 't of Corr.*, 347 Fed. Appx. 528, 531 (11th Cir. 2009) (discounting reliability of affidavits submitted by petitioner's former prison mates, friends, and relatives). And they completely lack "indicia of reliability, trustworthiness, or credibility." *Monk v. Gonzalez*, 583 Fed. Appx. 674, 676-77 (9th Cir. 2014). In any event, Mr. Rhoades and Mr. Wimmer contend that they tried to contact defense counsel. And Mr. Booth contends that he identified alibi witnesses but that defense counsel ignored him. The State represents that it contacted defense counsel but he refused to comment on the case in accordance with the attorney-client privilege. Counsel's commendable adherence to the principles of confidentiality is significant in

25

that Mr. Booth has not indicated any willingness to waive attorney-client confidentiality. Had he done so and obtained a declaration from defense counsel corroborating his claims about alibi witnesses, Mr. Booth might be able to establish a sufficient factual basis for a reference hearing. His bare assertions and those of his alleged witnesses are insufficient in this regard.

Dkt. 11-4 at 438 (Ex. 58).

The commissioner reasonably applied the *Strickland* standard. First, petitioner's bald assertion that he provided the names of alibi witnesses is uncorroborated by any evidence from defense counsel.[11] And even if counsel had been informed of the witnesses petitioner presented in his post-trial PRP, there is no evidence rebutting the presumption that counsel made a reasonable tactical decision not to call them.

In *Dunn v. Reeves*, the Supreme Court held the state court did not unreasonably apply federal law in rejecting an ineffectiveness claim based upon counsel's failure to pursue allegedly favorable testimony, where the petitioner failed to present evidence from counsel explaining why the evidence was not pursued. *Dunn v. Reeves*, 141 S.Ct. 2405, 2410–13 (2021). "Simply put, if the attorneys had been given the chance to testify, they might have pointed to information justifying the strategic decision to devote their time and efforts elsewhere." *Id.* at 2412. Under such circumstances, "given that the [state] court was entitled to reject [petitioner's] claim if trial counsel had any 'possible reaso[n] . . . for proceeding as they did,' it surely was not obliged to accept [petitioner's] blanket assertion on an incomplete evidentiary record that '[n]o reasonable strategy could support counsel's failure.'" *Id*. (internal citations omitted). Here, as in *Dunn*, the

---

[11] Indeed, petitioner himself testified at trial that he did not have any alibi witnesses. Dkt. 11-2 at 314 (Ex. 6) (Q: "Well, you didn't bring anybody with you today to verify your alibi, right?" A: "Nope. In my line of work you don't exactly have people like that.")

REPORT AND RECOMMENDATION - 25

state court reasonably applied federal law in holding that petitioner failed to overcome the presumption that counsel acted competently.

Furthermore, even if counsel could be found deficient for failing to pursue alibi evidence, petitioner cannot show a reasonable probability that but for counsel's errors, the jury's verdict would have been different. The evidence proffered by petitioner is extremely weak. Each witness had an extensive criminal record and was subject to impeachment; furthermore, the commissioner found that one of the affidavits was forged and some of the other witnesses equivocated on their statements. In contrast, petitioner's presence at the scene of the crime was established by testimony of one of the victims and another witness that petitioner himself acknowledged was present—as well as the presence of petitioner's DNA on the murder weapon. Where proffered alibi testimony is, as here, "extremely weak," the state court "reasonably determine[s] that [defense counsel] were not ineffective for failing to present this evidence." *Cunningham*, 704 F.3d at 1158–59.

Petitioner fails to rebut the strong presumption that defense counsel's failure to call alibi witnesses was deficient or prejudicial. Even if there were some question as to whether defense counsel's performance was deficient under *Strickland*, the Court cannot conclude that the state court's determination was itself an unreasonable application of *Strickland*. *See Harrington*, 562 U.S. at 101. The Court therefore recommends that petitioner's eighth ground for relief be dismissed with prejudice.

## EVIDENTIARY HEARING

The decision to hold an evidentiary hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which,

if true, would entitle the applicant to federal habeas relief." *Id.* at 474. In determining

whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to

the record before the state court. *Pinholster*, 563 U.S. at 180. A hearing is not required if

the allegations would not entitle petitioner to relief under § 2254(d). *Landrigan*, 550 U.S.

at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise

precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*;

*see Pinholster*, 563 U.S. at 186. The Court should find that it is unnecessary to hold an

evidentiary hearing in this case because petitioner's claims may be resolved on the

existing state court record.

<u>CERTIFICATE OF APPEALABILITY</u>

If the Court adopts the undersigned's Report and Recommendation, it must

determine whether a COA should issue. Rule 11(a), Rules Governing Section 2254

Cases in the United States District Courts ("The district court must issue or deny a

certificate of appealability when it enters a final order adverse to the applicant."). A COA

may be issued only where a petitioner has made "a substantial showing of the denial of

a constitutional right." 28 U.S.C. § 2253(c)(2)–(3). A petitioner satisfies this standard "by

demonstrating that jurists of reason could disagree with the district court's resolution of

his constitutional claims or that jurists could conclude the issues presented are

adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S.

322, 327 (2003).

The undersigned recommends that petitioner not be issued a COA. No jurist of

reason could disagree with the above evaluation of his constitutional claims or conclude

that the issues presented deserve encouragement to proceed further. Petitioner should

address whether a COA should issue in his written objections, if any, to this Report and Recommendation.

CONCLUSION

Based on the foregoing discussion, the undersigned recommends that the Court dismiss the petition for writ of habeas corpus with prejudice.

The parties have **fourteen (14) days** from service of this Report and Recommendation to file written objections thereto. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating the above time limit, the Clerk shall set this matter for consideration on **January 28, 2022**, as noted in the caption.

Dated this 7th day of January, 2022.

Theresa L. Fricke
Theresa L. Fricke
United States Magistrate Judge

Filed
Washington State
Court of Appeals
Division Two

November 5, 2019

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                     Respondent,<br><br>    v.<br><br>JOHN ALLEN BOOTH, JR.,<br><br>                   Appellant. | No. 49492-2-II<br>Consolidated with<br>No. 49499-0-II<br>No. 49519-8-II<br>No. 49512-1-II<br>No. 49509-1-II<br>No. 49502-3-II<br><br>UNPUBLISHED OPINION |

MELNICK, J. — John Booth appeals the denial of his motion to vacate his convictions, which he based on allegations that the State overheard protected attorney-client communications and used them against him. After a hearing on Booth's motion, the trial court found that Booth had received a fair trial and denied his motion. Booth also appeals from the court's ruling that vacated some, but not all, of his outstanding legal financial obligations (LFOs). He makes numerous arguments in support of his position.

We affirm.

## FACTS

### I.   CONVICTION

In 2010, Booth shot four people while attempting to collect a drug debt. Three of the victims died. After the shooting, Booth fled to Spokane where the police later found him. Booth awaited trial at the Lewis County Jail. While there, the police listened to a call made by Booth to his friend in Spokane. Through the call, the police were able to locate the murder weapon.

EXHIBIT 29
Page 1 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

A jury convicted Booth of two counts of murder in the first degree, one count of murder in the second degree, one count of attempted murder in the first degree, one count of attempted extortion in the first degree, and one count of unlawful possession of a firearm in the first degree. He appealed, and we affirmed his convictions.

## II.    MOTION TO VACATE

Booth then filed a motion to either vacate and dismiss the judgment and sentence or hold an evidentiary hearing.  He filed the motion pursuant to CrR 7.8.  Booth alleged that the State engaged in a pattern of eavesdropping during the preparation of his murder trial which intruded into his attorney-client communications.  The trial court scheduled a hearing.

### A.    Motion to Compel

Prior to the hearing, but after being appointed counsel, Booth filed a motion to compel the State to produce telephone records in its possession.[1]  Booth alleged the State had documents that would show it had a blanket policy of listening to inmates' attorney-client phone conversations or, at the least, had a plan to listen to his attorney-client conversations.  Booth requested, among other documents, "every document with [his] name anywhere in it in the possession of any branch of the law enforcement of [L]ewis [C]ounty or state controlled agency related to [his motion] in any way."  Clerk's Papers (CP) at 243.

The court held a hearing on the motion to compel, but Booth was not present.  At the hearing, the State argued that it had given Booth all relevant documents in its possession as part of discovery and that the jail had fully responded to Booth's Public Records Act (PRA) request. Booth presented no additional evidence.

---

[1] Although Booth personally filed the motion, it appears that his lawyer adopted it.  The lawyer argued the motion.

2

EXHIBIT 29
Page 2 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

At one point in the hearing, the court asked Booth's attorney whether Booth could identify any specific "items of discovery . . . with sufficient particularity that [the court] could actually direct the jail in the event that [it] found [Booth] was correct." 1 Report of Proceedings (RP) at 11. Booth's attorney responded that Booth "maintains that there is going to be some sort of documentation or meeting between staff members that they either collaborated or conspired with one another to listen to his conversations with his attorney." 1 RP at 11. The court denied Booth's motion.

B.      Evidentiary Hearing[2]

Booth alleged four separate instances of misconduct to support his motion to vacate. First, he alleged that the State listened to telephone calls he had with his attorney and those he had with his private investigator. Second, he alleged that jail staff and detectives listened to attorney-client conversations that occurred in the visitation rooms. Third, he alleged that a detective sat behind him in court and listened to attorney-client conversations that occurred there. And fourth, he alleged that a correctional officer (CO) overheard attorney-client conversations in a courthouse conference room.

1.      Jail's Phone System

The Lewis County Jail detained Booth for approximately 16 months. During that time, Global Tel Link (GTL) operated the jail's inmate phone system. A sign posted above the phone in the jail indicated that phone calls were monitored. However, GTL did not record known attorney-client phone calls. Lawyers provided their phone numbers to the jail. Jail staff then

---

[2] The court entered findings of fact and conclusions of law. Because Booth challenges many of them, we include the relevant evidence presented.

EXHIBIT 29
Page 3 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

inputted the numbers and GTL did not record any calls from those numbers. Booth's attorney at the time of his murder trial did not regularly practice in Lewis County.

At one point, CO Jack Haskins, whose job was to listen in on all recorded inmate phone calls, inadvertently overheard a conversation between Booth and his attorney. He did not intend to listen to any of Booth's attorney-client conversations. However, while listening to a call, the subject matter started "going towards legal questions, legal manner." 2 RP at 352. At that point, Haskins stopped listening and told his supervisor. He did not tell his supervisor the content of the conversation. The supervisor told Haskins to tell Booth what happened, which he did. Additionally, Haskins asked Booth to clarify what numbers Booth needed added to the attorney list.

Haskins did not tell anyone about the incident except Booth and his supervisor. No detective or prosecutor assigned to Booth's murder case had knowledge that Haskins overheard a phone call between Booth and his attorney.

Additionally, during his time at the jail, Booth lodged grievances alleging that the jail was improperly monitoring his phone calls to John Wickert,[3] the private investigator assisting his lawyer. The problem arose because Wickert ran both a bail bond company and a private investigation company. Booth would sometimes call the phone number associated with Wickert's bail bond company when he could not reach Wickert on the private investigation phone number. Initially, the jail refused to add the bail bond phone number to the do-not-record list. No detective or prosecutor assigned to Booth's case knew the jail heard any of Booth's conversations with Wickert or any of the substance of those conversations.

---

[3] Wickert did not testify at Booth's hearing.

EXHIBIT 29
Page 4 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

At one point during the hearing, Booth attempted to introduce a document that appeared to indicate which conversations of his the jail recorded and monitored; he obtained the document from a PRA request.  The State objected, arguing that the document was inadmissible because it had not been properly authenticated by a custodian of GTL.  The court sustained the objection.

2.    Jail's Visitation Rooms

During Booth's detention, the Lewis County Jail did not have completely soundproof attorney-client visitation rooms.  At one point, a local attorney knocked on Booth's visitation room while Booth was meeting with his attorney to tell them that he could hear them.  Based on complaints, the jail began making improvements.  It appears some of the improvements occurred while Booth was detained at the jail.

According to the COs who transported Booth from his cell to meet with his lawyer, they secured him in the visitation room and then stood in the hallway adjacent to the room.  On one occasion, CO Vernon West heard Booth say "that he did kill the kid and the kid had a gun."  1 RP at 101.  After hearing the statement, he and the other transport CO "immediately moved away."  1 RP at 102.  On subsequent meetings between Booth and his attorney, West stood at the end of the hall.  Booth could see the COs if he turned around while in the visitation room.

CO Curtis Lamping also heard Booth tell his lawyer something like, "The guy had the gun, so I had to shoot him."  1 RP at 181.  After hearing the statement, Lamping moved to the other end of the hall so he would not be able to hear Booth.

EXHIBIT 29
Page 5 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

According to West and Lamping, Booth seemed to speak particularly loud when he made the statements that they overheard.

Neither West nor Lamping intended to listen to Booth's conversations.  They also did not convey the substance of the conversation to anyone besides their fellow transport COs.  No other transport CO remembered learning that West or Lamping overheard Booth's conversations.

Roger Hunko, Booth's lawyer during his murder trial, did not know that Booth had concerns about his representation based on the fact that COs potentially overheard conversations in the visitation rooms.  Additionally, Hunko felt that he could communicate freely with Booth regarding his murder trial, and jail conditions did not affect his trial strategy.

>3.    Detective's Presence in Courtroom

Daniel Riordan, a detective on Booth's murder trial, worked as extra security in the courtroom during Booth's court appearances.  Riordan's supervisor told him to sit in the pew directly behind Booth.

At one point during a pretrial hearing, Booth accused Riordan of listening to his attorney-client conversations.  Booth informed the court of his concerns, and the court excluded Riordan from the courtroom.  After the incident, Riordan no longer worked as extra security in the courtroom.

At no point during his time as security did Riordan overhear or intend to overhear conversations between Booth and his lawyer.  He also did not see any notes written by Booth or his attorney.

EXHIBIT 29
Page 6 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

        4.        Court Conference Room

On one occasion when West transported Booth to court, the court gave Booth and his attorney a conference room to meet.  During the meeting, West sat in the room on the far side.[4]  According to Hunko, West's presence or the fact that he could potentially overhear their conversation did not affect his trial strategy.

        5.        Jail Policy

Lewis County had a policy that COs were not to actively listen in on attorney-client conversations.

No jail supervisor ever instructed a CO to listen to conversations between inmates and attorneys, or between Booth and his attorney.  Besides the COs who directly overheard Booth's attorney-client conversations, no one knew the contents of any of Booth's conversations with his attorneys.

        6.        Excluding Booth's Testimony

At one point during the hearing, Booth was asked whether he had lost faith in his attorney during the preparation of his murder trial because of the State's intrusions into his attorney-client communications.  The State objected, and the court sustained the objection as irrelevant.  The court continued, discussing it had knowledge of discord between Booth and Hunko during his murder trial, evidenced by the bar complaint that Booth had filed.

---

[4] Neither party asked questions of West related to this incident.  However, West testified that, aside from the incident in which he overheard Booth's conversation in the attorney-client visitation room, he did not learn anything else between Booth and his attorneys that he shared with anyone. He also actively avoided hearing inmates' conversations with their attorneys.

EXHIBIT 29
Page 7 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

7.    Findings of Fact and Conclusions of Law

At the conclusion of the evidence, the court denied Booth's motion.  It then entered the

following relevant findings of fact:

1.1.    There was no pattern of eavesdropping on conversations between the defendant and his attorney.

. . . .

1.5.    After Mr. Booth was placed in the attorney visitation booth, the corrections staff would proceed down the hallway so that the inmate side of the interview room was still in view.

. . . .

1.7.    On the two occasions where corrections staff inadvertently overheard Mr. Booth yell to his lawyer, they immediately took steps to distance themselves away from the attorney/client booths where the conversations took place.

1.8.    Lewis County corrections staff were never instructed, either by their own command staff, a detective assigned to the case, or the prosecutor's office, to eavesdrop on conversations between Mr. Booth and his lawyer.

1.9.    No communication between Mr. Booth and his lawyer that may have been inadvertently heard by corrections staff was ever passed on to jail command staff, law enforcement, the criminal investigation side of the sheriff's office, or the prosecutor's office.

1.10.    The members of the corrections staff doing transport of Mr. Booth had what the court referred to as a "self-imposed gag order" on any communication between Mr. Booth and his lawyer that might have been inadvertently overheard by transport officers.

. . . .

1.14.    There was nothing done intentionally, by anyone in the Lewis County corrections staff, law enforcement, or the prosecutor's office, to unlawfully compromise Mr. Booth's defense of his case.

. . . .

1.16.    Mr. Booth's assertion that he was intimidated or lost confidence in Mr. Hunko due to the condition of the attorney visitation booths was not supported by Mr. Hunko's testimony.

1.17.    It is not beyond the scope of the court's imagination that Mr. Booth may have deliberately raised his voice when speaking with his lawyer, with the intention of raising the issue of the lack of soundproofing of the attorney visitation booths on appeal.

. . . .

1.19.    If a defense attorney gives the jail his/her phone number, that number is blocked in the jail phone call system so it cannot be recorded or intercepted.

. . . .

8

EXHIBIT 29
Page 8 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

1.22.    Officer Haskins did not report to anyone the content of [Booth's] phone call.  Officer Haskins did not report the call to the law enforcement side of the Sheriff's office, the detectives, or the prosecutor's office.

. . . .

1.26.    Officer West did not overhear any of the conversation between Mr. Hunko and Mr. Booth while he was in the conference room in the courthouse with Mr. Hunko and Mr. Booth.

. . . .

1.29.    At no time did Mr. Hunko express to the court that he felt, in any way, that his ability to represent Mr. Booth thoroughly and completely in the court of this case was impacted as a result of corrections staff being in the conference room with him and his client.

CP at 352-56.  The court concluded that Booth received a fair trial and was not denied due process.

C.    Motion to Expand the Record

A few months after the hearing, the court held a hearing that addressed, among other motions, Booth's motion to expand the record from the evidentiary hearing.  Booth asked the court to include in the record a jail handbook indicating that "calls to your attorneys will not be recorded."  3 RP at 589.

The court denied the motion stating that sufficient testimony offered at the hearing already established that the jail did not record known attorney-client calls.  Booth contested the court's characterization of the testimony.  The court replied to Booth, stating, "[Y]our claims as to what actually happened and what the evidence showed are not accurate."  3 RP at 595.

D.    Motion to Vacate LFOs

Booth also filed a motion to vacate his outstanding LFOs.  The State agreed that it could not collect from Booth's 1996, 1998, and 1999 cause numbers.  The court then signed orders stating that the State's ability to collect on these cases had expired.  The court also vacated all discretionary LFOs from Booth's 2003, 2004, and 2010 cases.

EXHIBIT 29
Page 9 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

Booth argued that because he could only make, at most, $15 per month while he was incarcerated and because he would be incarcerated the rest of his life, the remaining mandatory LFOs violated his rights under the Eighth Amendment to the United States Constitution. The court rejected his argument. Booth appeals.

## ANALYSIS

### I. RIGHT TO COUNSEL AND DUE PROCESS

Booth argues that the eavesdropping by the jail staff violated his rights to counsel and to due process. Booth assigns error to numerous findings of fact, contending that substantial evidence does not support the findings. Additionally, Booths argues that the court's findings do not support its conclusion. We disagree.

#### A. Legal Principles

We review a trial court's decision on a CrR 7.8 motion for an abuse of discretion. *State v. Smith*, 159 Wn. App. 694, 699, 247 P.3d 775 (2011). We review a trial court's factual findings for substantial evidence. *State v. Ieng*, 87 Wn. App. 873, 877, 942 P.2d 1091 (1997). Substantial evidence is a sufficient quantity of evidence to persuade a rational, fair-minded person that a finding is true. *State v. Schultz*, 170 Wn.2d 746, 753, 248 P.3d 484 (2011). Unchallenged findings of fact are verities on appeal. *State v. Pippin*, 200 Wn. App. 826, 834, 403 P.3d 907 (2017). We defer to the trial court on credibility issues. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

We review a trial court's conclusions of law de novo to see if they are supported by the findings. *Ieng*, 87 Wn. App. at 877.

EXHIBIT 29
Page 10 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

A defendant's right to counsel is protected by the United States and Washington constitutions. U.S. CONST. amend. V, VI; WASH. CONST. art. I, § 22. Intrusion into private attorney-client communications violates a defendant's right to effective representation and due process. *State v. Cory*, 62 Wn.2d 371, 374-75, 382 P.2d 1019 (1963). When the State eavesdrops on a defendant's attorney-client privileged communication, we presume prejudice. *State v. Peña Fuentes*, 179 Wn.2d 808, 819-20, 318 P.3d 257 (2014). However, this presumption is rebuttable by the State if it can "show beyond a reasonable doubt that the defendant was not prejudiced." *Peña Fuentes*, 179 Wn.2d at 820.

B.    Substantial Evidence Supports the Challenged Findings

Booth challenges approximately 13 of the court's findings of fact on the basis that substantial evidence does not support them. We have reviewed the record and disagree with Booth. Substantial evidence supports the challenged findings.

Booth also assigns error to seven additional findings of fact; however, he does not provide argument as to why these findings are deficient. RAP 10.3(a)(6). We conclude that these findings are verities. *Pippin*, 200 Wn. App. at 834.

C.    Findings Support the Court's Conclusions

Booth's argument on how the trial court misapplied the law is not entirely clear. It appears that Booth is arguing that the State's intrusion does not have to be intentional to raise the rebuttable presumption of prejudice, and thus, the State must prove harmlessness beyond a reasonable doubt even if it only inadvertently overheard attorney-client communications. We conclude that, regardless of Booth's inadvertence argument, the State did in fact carry its burden and that the trial court's conclusions are supported by its findings.

11

EXHIBIT 29
Page 11 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

Here, the court found that when Booth and Lamping overheard Booth's conversation in the visitation room, they immediately distanced themselves. It also found that West, Lamping, and the other transport COs had a "self-imposed gag order" where they would not and did not share any information inadvertently overheard. CP at 354. Haskins similarly did not share the content of the attorney-client telephone call that he inadvertently overheard. The court also found that West did not overhear anything while he was in the courthouse conference room with Booth and Hunko. Finally, "[n]o communication between Mr. Booth and his lawyer that may have been inadvertently heard by corrections staff was ever passed on to jail command staff, law enforcement, the criminal investigation side of the sheriff's office, or the prosecutor's office." CP at 353.

Therefore, we conclude that the trial court's findings support the conclusion that Booth was not prejudiced.[5]

Based on all of the above, we conclude that substantial evidence supports the trial court's findings and that its findings support its conclusion that no violation of Booth's right to effective representation or due process occurred.

II.    MOTION TO COMPEL

Booth argues that the trial court abused its discretion when it denied his motion to compel, which sought various evidence. We disagree.[6]

---

[5] Because we conclude that the State showed beyond a reasonable doubt that Booth was not prejudiced, we do not decide whether the inadvertent overhearing of confidential attorney-client communications is a Sixth Amendment violation. Booth argues in the alternative that we should remand this issue to the trial court for additional fact finding. Because of our resolution of this issue, we disagree with Booth.

[6] We reject the State's argument that we should not consider Booth's argument based upon his failure to accurately cite the record.

EXHIBIT 29
Page 12 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

CrR 4.7 governs criminal discovery. However, "prisoners seeking postconviction relief are not entitled to discovery as a matter of ordinary course, but are limited to discovery only to the extent the prisoner can show good cause to believe the discovery would prove entitlement to relief." *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 391, 972 P.2d 1250 (1999).

We review a trial court's denial of a motion to compel discovery for an abuse of discretion. *State v. Norby*, 122 Wn.2d 258, 268, 858 P.2d 210 (1993). A trial court abuses its discretion when it decides a matter on untenable grounds or reasons, or when no reasonable judge would have reached the same conclusion. *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012); *State v. Lusby*, 105 Wn. App. 257, 262, 18 P.3d 625 (2001).

Here, Booth's motion sought a voluminous amount of records, including "every document with [his] name anywhere in it in the possession of any branch of the law enforcement of [L]ewis [C]ounty or state controlled agency related to [his CrR 7.8 motion] in any way." CP at 243. The State responded that it had provided all relevant documents.

At a hearing on the motion, the court asked Booth whether he could identify specific "items of discovery . . . with sufficient particularity that [the court] could actually direct the jail in the event that [it] found [Booth] was correct." 1 RP at 11. Booth could not comply with the court's request.

Given the broad scope of Booth's request, coupled with his inability to refine his request, we conclude that the trial court did not abuse its discretion in denying Booth's motion to compel.

III.    EXCLUDING BOOTH'S PROFFERED EVIDENCE

Booth argues that the trial court abused its discretion when it prevented him from testifying about his lack of confidence in his attorney. We disagree.

EXHIBIT 29
Page 13 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.  Relevant evidence is generally admissible. ER 402.  Yet, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  ER 403.

Here, it seems clear that the trial court viewed Booth's proposed testimony, indicating he had lost faith in his attorney during the preparation of his murder trial, as the "needless presentation of cumulative evidence."  ER 403.  It recognized that Booth had filed a bar complaint against Hunko, and it was aware that Booth had been unsatisfied with Hunko's representation.  Viewing the totality of testimony, we conclude that the trial court did not abuse its discretion in limiting Booth's testimony.

IV.     MOTION TO EXPAND THE RECORD

Booth argues that his post-hearing request to expand the record, made months after the evidentiary hearing, amounted to a motion to reopen the case and that the trial court abused its discretion in denying his motion.  We disagree.

"Generally, the issue of whether to allow a party to reopen its case to present further evidence is a matter within the discretion of the trial court."  *State v. Brinkley*, 66 Wn. App. 844, 848, 837 P.2d 20 (1992).  "A trial court's actions in regard to reopening of a case will be upheld except upon a showing of manifest abuse of discretion and prejudice resulting to the complaining party."  *Brinkley*, 66 Wn. App. at 848.

14

EXHIBIT 29
Page 14 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

Here, Booth essentially asked the court to reconsider its ruling in light of newly proffered evidence, namely a jail handbook which indicated that the jail would not record calls by inmates to their attorneys. The court denied the motion, finding the evidence cumulative. Numerous witnesses testified at trial that once the jail registered an attorney's number in their phone-system database, all calls to that number would not be recorded. Thus, the purpose for which Booth offered the jail handbook was merely cumulative to testimony already in the record. Therefore, we conclude that the trial court did not abuse its discretion in refusing to reopen the case.

V.    INEFFECTIVE ASSISTANCE OF COUNSEL

Booth argues that he received ineffective assistance of counsel when his counsel failed to obtain a GTL records custodian to authenticate phone records. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011).

We review claims of ineffective assistance of counsel de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail on a claim of ineffective assistance of counsel, the defendant must show both (1) that defense counsel's representation was deficient and (2) that the deficient representation prejudiced the defendant. *Grier*, 171 Wn.2d at 32-33. If either prong is not satisfied, the defendant's claim fails. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 673, 101 P.3d 1 (2004).

There is a strong presumption that counsel's representation was effective. *State v. Brett*, 126 Wn.2d 136, 198, 892 P.2d 29 (1995). Representation is deficient if, after considering all the circumstances, the performance falls "'below an objective standard of reasonableness.'" *Grier*,

EXHIBIT 29
Page 15 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

171 Wn.2d at 33 (quoting *Strickland*, 466 U.S. at 688).  "The burden is on a defendant alleging ineffective assistance of counsel to show deficient representation based on the record established in the proceedings below."  *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).  We do not consider matters outside the trial record.  *State v. Linville*, 191 Wn.2d 513, 525, 423 P.3d 842 (2018).  Legitimate trial strategy or tactics cannot serve as the basis for a claim of ineffective assistance of counsel.  *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).

To show prejudice, a defendant must establish that "there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different."  *Kyllo*, 166 Wn.2d at 862.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.

Booth has not shown how he was prejudiced.  Booth's proffered evidence appeared to indicate which conversations of his were recorded and monitored.  However, besides Haskins, who overheard a portion of Booth's phone call, every witness who was asked whether they were aware that someone had overheard a phone call between Booth and his attorney answered no.  Thus, whether Booth's calls were recorded, which the State agreed they were, was of minimal importance.  Instead, the critical inquiry at Booth's hearing was whether jail staff shared the content of the overheard attorney-client conversation.  *See Peña Fuentes*, 179 Wn.2d at 819-20.  They testified that they did not.  It appears Booth's proffered evidence would not have rebutted this testimony.  Therefore, we conclude that Booth's ineffective assistance of counsel claim fails.

VI.    LFOs

Booth argues that the LFOs imposed on him violate RCW 10.01.160, the Eighth Amendment to the United States Constitution, and article I, § 14 of the Washington Constitution. We reject Booth's argument.

EXHIBIT 29
Page 16 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

A.    Legal Principles

We generally review a decision imposing LFOs for abuse of discretion. *State v. Clark*, 191 Wn. App. 369, 372, 362 P.3d 309 (2015).  A trial court abuses its discretion when it exercises discretion in a manifestly unreasonable manner or bases its decision on untenable grounds or reasons. *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001).  "We review constitutional challenges de novo." *State v. Beaver*, 184 Wn.2d 321, 331, 358 P.3d 385 (2015).

B.    The Court Did Not Abuse Its Discretion

Because Booth's case was final prior to 2018, when the legislature made changes to the LFO statutes, those changes do not affect him. *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018).

Here, the court vacated all discretionary LFOs from Booth's 2003, 2004, and 2010 cases. However, it did not vacate the crime victim penalty assessments, criminal filing fees, DNA database fees, and restitution because it did not have the discretion to do so, as they were mandatory.  Former RCW 7.68.035(1)(a) (2003, 2004, 2010); former RCW 9.94A.753(5) (2003, 2004, 2010); former RCW 36.18.020 (2003, 2004, 2010); former RCW 43.43.7541 (2003, 2004, 2010); *see also State v. Lundy*, 176 Wn. App. 96, 102, 308 P.3d 755 (2013).  Therefore, we conclude that the trial court did not abuse its discretion by continuing to impose mandatory LFOs on Booth.[7]

ATTORNEY FEES

Booth requests that this court not award the State appellate costs under RAP 14.

---

[7] Booth makes other challenges to his LFOs; however, because they were final in 2018, this appeal is not the proper forum to raise them.

EXHIBIT 29
Page 17 of 18

49492-2-II / 49499-0-II / 49519-8-II / 49512-1-II / 49509-1-II / 49502-3-II

The State does not request costs or otherwise respond.  It is premature for us to address this issue at this time.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Maxa, C.J.

Glasgow, J.

EXHIBIT 29
Page 18 of 18



# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

In the Matter of the Personal Restraint of:

JOHN ALLEN BOOTH, JR.,

           Petitioner.

NO. 9 2 8 3 3 - 9

RULING DISMISSING PERSONAL
RESTRAINT PETITION

      John Booth was convicted in 2011 of one count of second degree murder, two counts of first degree murder, one count of attempted first degree murder, one count of attempted first degree extortion, and one count of first degree unlawful possession of a firearm. He was sentenced as a persistent offender to life imprisonment without early release. Division Two of the Court of Appeals affirmed the judgment and sentence on direct appeal, issuing its mandate in March 2015. In January 2016 Mr. Booth filed a timely personal restraint petition (his third) in the Court of Appeals, but finding the petition improperly successive in that court, the acting chief judge transferred it to this court. *See In re Pers. Restraint of Perkins*, 143 Wn.2d 261, 266-67, 19 P.3d 1027 (2001). Now before me for determination is whether to dismiss the petition or refer it to the court for a determination on the merits. RAP 16.5(d); RAP 16.11(b).



Exhibit 58
Page 1 of 11

As a personal restraint petitioner challenging his judgment and sentence, Mr. Booth bears the burden of proving by a preponderance of the evidence that he was actually and substantially prejudiced by constitutional error or that error of a nonconstitutional nature occurred that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Elmore,* 162 Wn.2d 236, 251, 172 P.3d 335 (2007). To obtain a reference hearing or other form of collateral relief, Mr. Booth must support his claims with competent evidence and reasoned argument. *In re Pers. Restraint of Rice,* 118 Wn.2d 876, 828 P.2d 1086 (1992); *State v. Brune,* 45 Wn. App. 354, 363, 725 P.2d 454 (1986). Bald assertions and conclusory allegations based on speculation, conjecture, or inadmissible evidence will not suffice. *In re Pers. Restraint of Yates,* 177 Wn.2d 1, 18, 296 P.3d 872 (2013). If Mr. Booth fails to present an arguable basis for collateral relief in law or fact given the constraints of the personal restraint petition procedure, his collateral challenge must be dismissed as frivolous under RAP 16.11(b). *In re Pers. Restraint of Khan,* 184 Wn.2d 679, 686-87, 363 P.3d 577 (2015).

Mr. Booth makes the following claims: (1) through plea negotiations the State intimidated Mr. Booth's alleged accomplice into not testifying in Mr. Booth's favor; (2) the trial court erred in not granting Mr. Booth's request to appoint new counsel and continue the trial to allow new counsel to prepare; (3) defense counsel was ineffective in (a) failing to move to suppress evidence stemming from the seizure and search of Mr. Booth's cell phone, (b) failing to move to suppress late-disclosed ballistics evidence, (c) failing to timely consult with and procure an expert on cell phone triangulation (to support a defense that Mr. Booth was not at the location of the shootings), (d) failing to contact and interview alibi witnesses, (e) failing in these respects to present a complete defense, (f) failing to object to the sentence aggravating factor of egregious lack of remorse, and (g) having a conflict of interest in not wanting

Exhibit 58
Page 2 of 11

to defend the case; (4) cumulative error denied him a fair trial; and (5) the trial court erred in imposing legal financial obligations that Mr. Booth has no chance of paying given his life sentence.

In making his intimidation claim, Mr. Booth relies on what purports to be the signed affidavit by his alleged accomplice, Ryan McCarthy, who claims that the State coerced him in plea negotiations into not testifying in Mr. Booth's favor at trial. But the State has produced Mr. McCarthy's written statement, signed under penalty of perjury, in which he asserts that a detective showed him the affidavit, that he had never seen it before, and that he never signed it. The detective watched Mr. McCarthy sign the statement and a copy of the purported affidavit. That signature differs markedly from the purported signature on the affidavit presented by Mr. Booth. Mr. Booth denies forging Mr. McCarthy's signature on the affidavit but admits that he did not see Mr. McCarthy sign it, claiming without any proof that he received it from Mr. McCarthy in the prison mail. I can only conclude that the affidavit is not competent evidence because it has not been authenticated. *Rice*, 118 Wn.2d at 886. Mr. Booth's intimidation claim will therefore not be considered further.

As to Mr. Booth's failed motion to replace counsel and for a continuance, he made these motions on the first day of trial and more than a year after counsel had been appointed. The trial court's decisions on both types of motions are reviewed for abuse of discretion. *See State v. Cross*, 156 Wn.2d 580, 607, 132 P.3d 80 (2006) (motion to discharge counsel and proceed pro se); *State v. Varga*, 151 Wn.2d 179, 200, 86 P.3d 139 (2004) (motion to appoint new counsel and for continuance to find new counsel). Mr. Booth's Sixth Amendment right to counsel does not include the right to any appointed counsel of his choosing. *Varga*, 151 Wn.2d at 200. Mr. Booth must show good cause for substituting counsel, such as a conflict of interest, irreconcilable conflict between counsel and client, or a complete breakdown in

Exhibit 58
Page 3 of 11

communication between himself and counsel. *Id.* Ordinarily, a defendant's general loss of trust or confidence in counsel is insufficient to support substitution. *Id.* When reviewing the trial court's denial of a motion to substitute counsel, this court considers (1) the extent of the conflict between counsel and defendant, (2) the adequacy of the trial court's inquiry into the conflict, and (3) the timing of the defendant's motion. *Cross*, 156 Wn.2d at 607.

     As indicated, Mr. Booth moved to replace counsel on the first day of trial, more than a year after counsel had been appointed. The records provided show that Mr. Booth was unhappy with counsel for allegedly failing to interview State witnesses and for failing to procure a defense expert on cell tower "pinging." Mr. Booth argued that the cell tower testimony would be exculpatory by placing him at a different location near the time of the crimes. But Mr. Booth also stated that he had a great relationship with defense counsel, though he was unhappy with certain aspects of counsel's performance. The State represented that it did not intend to introduce cell tower evidence as it related to Mr. Booth. Defense counsel declined to respond on the record to Mr. Booth's allegations in order to protect the attorney-client privilege. The trial court made reasonable inquiries in light of the situation. The court recognized that defense counsel might have had legitimate strategic reasons for not interviewing prosecution witnesses and for not calling a cell tower expert. The court also noted that the proposed cell tower evidence might not have any exculpatory value, absent evidence that Mr. Booth was actually using his phone, which was not apparent. The court also noted its familiarity with and professional respect for defense counsel, who was qualified to represent death penalty defendants. In these circumstances, the trial court did not abuse its discretion in denying Mr. Booth's request. It follows logically that the court did not abuse its discretion in denying a continuance for purposes of

Exhibit 58
Page 4 of 11

allowing replacement counsel to prepare. Mr. Booth argues more time was needed to interview potential alibi witnesses, but he did not assert an alibi defense.

Mr. Booth next argues that defense counsel was ineffective in various ways. To establish ineffective assistance of trial counsel, Mr. Booth must show that counsel's professional performance fell below an objective standard of reasonableness and that, but for counsel's deficiencies, there is a reasonable probability the outcome would have been different. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012); *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Crace*, 174 Wn.2d at 840. Counsel's performance is presumed to be competent, and Mr. Booth bears the burden of showing that there was no conceivable legitimate tactical reason for counsel's professional decisions. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

Mr. Booth first faults counsel for not challenging the warrant authorizing a search of Mr. Booth's wireless phone. Under the circumstances, it was not an unreasonable tactical decision to forego such a challenge. The warrant in this instance was issued after a judge determined that it was supported by probable cause. *State v. Maddox*, 152 Wn.2d 499, 505, 98 P.3d 1199 (2004). The State presented ample information to support probable cause to search the phone. Its investigation indicated that Mr. Booth's phone would contain evidence of communications between him and other persons connected with the shootings and Mr. Booth's subsequent evasion of law enforcement. It would have been futile for defense counsel to challenge the warrant, and even if he should have brought a suppression motion (which I need not decide), the trial court would not have granted it. Mr. Booth can show neither deficient performance nor prejudice on this issue.

Exhibit 58
Page 5 of 11

Mr. Booth further contends that defense counsel was ineffective in failing to move to suppress late-disclosed ballistics evidence. The State concedes that it was several days late disclosing evidence matching a firearm with Mr. Booth's DNA on it with the bullets used in the shooting. There is no evidence that the failure to comply with the discovery deadline was intentional or the product of bad faith; the late disclosure was an oversight that was promptly corrected. Defense counsel could have moved to suppress the evidence as a discovery sanction, but there is no reasonable probability that the trial court would have granted the motion had one been made. To prevail on such a motion, Mr. Booth would have had to show that the late disclosure prejudicially forced him to choose between his right to a speedy trial and his right to adequately prepared counsel. *See State v. Woods*, 143 Wn.2d 561, 582-83, 23 P.3d 1046 (2001) (discussing motion to dismiss prosecution for discovery violation). Defense counsel complained about the late disclosure but conceded that the defense ballistic expert would need about a month to evaluate the State's evidence in any event. The defense asked for a one-month continuance to allow the defense expert time to evaluate the State's ballistic report and possibly retest the weapon. The trial court granted the continuance. The new trial date was nearly a month before expiration of the speedy trial deadline. Under the circumstances, defense counsel made a reasonable tactical decision to move for a continuance.

Mr. Booth also claims defense counsel was ineffective in failing to timely consult with and procure an expert on cell phone triangulation. Defense counsel apparently had some communication with Jeff Fischbach, a purported expert on cell tower triangulation, but counsel ultimately did not call Mr. Fischbach as a witness. Mr. Booth has produced an affidavit in which Mr. Fischbach makes a preliminary conclusion that Mr. Booth was not in the vicinity of the shooting "within several hours" of that event. But Mr. Booth fails to provide a proper foundation for

Exhibit 58
Page 6 of 11

Mr. Fischbach's alleged expertise. There is no curriculum vitae establishing Mr. Fischbach's expertise in this area, and Mr. Fischbach fails to explain his scientific methods or how he otherwise arrived at his conclusory assertion that Mr. Booth was not in the vicinity of the crimes. This is not competent evidence for purposes of obtaining a reference hearing. *See Rice*, 118 Wn.2d at 886.

Furthermore, Mr. Fischbach's conclusion contradicts Mr. Booth's own version of events, which has him leaving the scene of the shooting much closer in time to the event. Moreover, two eyewitnesses placed Mr. Booth at the scene at the time of the shooting, including a surviving victim who recalled being shot by Mr. Booth. And Mr. Fischbach would have been subject to cross-examination on his methods and the reliability of his conclusions, and possibly rebuttal evidence from the State's cell phone expert (who the State did not call in its case in chief). In sum, if defense counsel was deficient in not calling Mr. Fischbach (which I need not decide), Mr. Booth does show there is a reasonable probability that putting him on the stand would have resulted in acquittal.

Mr. Booth next asserts that defense counsel was ineffective in failing to contact and interview alibi witnesses. As indicated, Mr. Booth did not assert an alibi defense, and he has produced no independent evidence that he informed defense counsel or defense investigators of alibi witnesses. Mr. Booth now presents the affidavits of incarcerated offenders Ryan McCarthy, Gordon Harper, and Joshua Rhoades. Mr. Booth also presents an affidavit signed by Corey Wimmer, who is not incarcerated but who also has a significant criminal history. The State sent a detective to speak with all four affiants, and the detective drafted and signed under penalty of perjury an investigation report documenting his contact with these men. As indicated, Mr. McCarthy confirmed to the detective that he had never seen the affidavit before and he did not sign it. Mr. Harper confirmed signing the affidavit, in which he claims

he was with Mr. Booth at the "Red Barn" tavern when the shooting occurred elsewhere. But he partially recanted to the detective, saying he actually could not recall the day and time that he was with Mr. Booth at the Red Barn. Mr. Rhoades, who claimed to be with Mr. Booth at the Red Barn when the shooting occurred, and that he unsuccessfully tried to contact defense counsel, refused to confirm anything about the affidavit when contacted by the detective. Mr. Wimmer states in the affidavit that he met Mr. Booth at 2 a.m. on "a Saturday" and that he unsuccessfully tried to contact defense counsel. When contacted by the detective, Mr. Wimmer merely said that the affidavit speaks for itself and that he signed it. He also said he did not like "snitches," apparently referring to Mr. McCarthy.

The veracity of these affidavits are highly questionable, particularly in light of the apparent forgery of Mr. McCarthy's signature. *See Milton v. Sec'y, Dep't of Corr.*, 347 Fed. Appx. 528, 531 (11th Cir. 2009) (discounting reliability of affidavits submitted by petitioner's former prison mates, friends, and relatives). And they completely lack "indicia of reliability, trustworthiness, or credibility." *Monk v. Gonzalez*, 583 Fed. Appx. 674, 676-77 (9th Cir. 2014). In any event, Mr. Rhoades and Mr. Wimmer contend that they tried to contact defense counsel. And Mr. Booth contends that he identified alibi witnesses but that defense counsel ignored him. The State represents that it contacted defense counsel but he refused to comment on the case in accordance with the attorney-client privilege. Counsel's commendable adherence to the principles of confidentiality is significant in that Mr. Booth has not indicated any willingness to waive attorney-client confidentiality. Had he done so and obtained a declaration from defense counsel corroborating his claims about alibi witnesses, Mr. Booth might be able to establish a sufficient factual basis for a reference hearing. His bare assertions and those of his alleged witnesses are insufficient in this regard.

Exhibit 58
Page 8 of 11

Mr. Booth contends that defense counsel was ineffective in failing to present a "complete" defense. This claim is mainly a generalized encapsulation of the preceding claims of ineffective assistance. As indicated, none of them has merit. The records provided amply demonstrate that Mr. Booth was represented by a skillful advocate who made reasonable tactical decisions in light of the strength of the State's case.

Mr. Booth next argues that defense counsel was ineffective in failing to object to jury instructions on the aggravating factor of egregious lack of remorse. The jury was instructed on this aggravating factor as it related to the two first degree murder victims, David West, Jr., and Tony Williams. *See* RCW 9.94A.535(3)(q) (aggravating factor applicable when "defendant demonstrated or displayed an egregious lack of remorse."). Jury instructions are proper if they are not misleading, properly state the law of the case, and allow the parties to argue their theories of the case, so long as sufficient evidence supports the instruction. *State v. Redmond*, 150 Wn.2d 489, 493, 78 P.3d 1001 (2003).

The murder spree in this case started with the fatal shooting of David West, Sr., which resulted in Mr. Booth's conviction for second degree murder. Mr. Booth then shot Mr. West's girlfriend, Denise Salts, in the face, but she survived to testify against Mr. Booth at trial. Mr. Booth was convicted of attempted first degree murder of Ms. Salts. Mr. Williams fled down a hallway, begging Mr. Booth not to shoot him, but Mr. Booth caught him and shot him in the head at close range. Mr. Booth then dragged David West, Jr. ("DJ") out of bed by his hair and held him down near the dying or deceased Mr. Williams's head. He then dragged DJ down the hall and into the living room, where he shot him in the back of the head at close range. John Linberg, a friend of Mr. West, hid from the slaughter and emerged unscathed to testify about Mr. Booth's role in the shootings. Mr. Booth fled to Spokane and hid the gun in

the attic of a house. His demeanor while testifying at trial can best be described as nonchalant, joking about the names of individuals, and quipping during cross-examination that he was thinking of shooting the prosecutor. There was ample evidence to support the instruction and the jury's special verdict findings of egregious lack of remorse. To the extent counsel could have objected to the instructions, Mr. Booth does not show prejudice under these facts.

And finally, Mr. Booth claims that defense counsel had a conflict of interest in not wanting to defend the case. The records provided in this matter contradict that assertion, showing the work of a vigorous and capable advocate. More generally, Mr. Booth fails to establish any persuasive grounds for asserting ineffective assistance of counsel.

Mr. Booth contends that cumulative error denied him a fair trial. Cumulative error may warrant reversal even if each error standing alone would otherwise be considered harmless. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). But the doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial. *Id.* That is the situation here.

Mr. Booth further argues that the trial court violated the Eighth Amendment prohibition against cruel and unusual punishment when it imposed legal financial obligations that he has no chance of paying given his life sentence. The Court of Appeals rejected this argument on the merits in Mr. Booth's direct appeal, holding that the trial court made adequate findings as to both mandatory and discretionary legal financial obligations, and further holding that the indigency issue was not ripe for review in any event due to the lack of collection efforts. This is a slight variation of an argument Mr. Booth raised on direct appeal. An issue raised and rejected on direct appeal will not be reconsidered on collateral review unless interests of justice so require. *Yates*, 177 Wn.2d at 17. Subsequent to Mr. Booth's direct

Exhibit 58
Page 10 of 11

individualized inquiry into a defendant's present and future ability to pay discretionary legal financial obligations before it imposes them. *State v. Blazina*, 182 Wn.2d 827, 838, 344 P.3d 680 (2015). The Court of Appeals did not have the benefit of *Blazina* when deciding Mr. Booth's direct appeal, but this court more recently held that *Blazina* does not constitute a significant change in the law for purposes of exempting an otherwise untimely personal restraint petition. *In re Personal Restraint of Flippo*, 187 Wn.2d 106, 111-13, 385 P.3d 128 (2016). Mr. Booth's collateral challenge is timely, but the same reasoning applies. *See* RAP 16.4(c)(4) (restraint unlawful where there has been significant change in law that is material and retroactively applicable); *Yates*, 177 Wn.2d at 17 (intervening change in law may justify reconsidering issue rejected on direct appeal). Mr. Booth had ample opportunity to challenge legal financial obligations on direct appeal on the same basis as that asserted in *Blazina*. His arguments as to this issue were rejected on the merits on appeal, and he shows no compelling basis in the interests of justice for having the issue reconsidered now.

In sum, Mr. Booth fails to establish that he is unlawfully restrained or is otherwise entitled to relief by personal restraint petition. And because he fails to present an arguable basis for relief in law or fact given the constraints of the personal restraint petition procedure, Mr. Booth's petition must be dismissed as frivolous under RAP 16.11(b). *Khan*, 184 Wn.2d at 686-87.

The personal restraint petition is dismissed.[1]

_____
DEPUTY COMMISSIONER

April 13, 2017

---

[1] In light of this ruling, Mr. Booth's motion for appointment of counsel is denied.

Exhibit 58
Page 11 of 11